# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39759**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Michael T. MEIER**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 15 December 2020

———————————

*Military Judge:* Willie J. Babor (arraignment); Mark W. Milam.

*Approved Sentence:* Dishonorable discharge, confinement for 503 days, reduction to E-1, and a reprimand. Sentence adjudged 26 March 2019 by GCM convened at Royal Air Force Lakenheath, United Kingdom.

*For Appellant:* Major Kevin R. Cayton, USAF; Captain Amanda E. Dermady, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

MEGINLEY, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, in accordance with his pleas and pursuant to a pretrial agreement (PTA), of two specifications of attempted sexual abuse of a child, in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for 503 days, reduction to the grade of E-1, and a reprimand. The military judge credited Appellant with two days against his sentence for time Appellant spent in pretrial confinement. Consistent with the terms of the PTA, trial counsel withdrew and dismissed three other specifications upon announcement of Appellant's sentence.[2] The convening authority approved the sentence as adjudged.

Appellant raises four assignments of error on appeal: (1) whether the military judge abused his discretion in denying testimony from a defense witness, JG, in presentencing; (2) whether the military judge erred by deducting 37 days of confinement credit for Appellant's illegal pretrial punishment prior to announcement of sentence; (3) whether the report of result of trial (RRT), action of the convening authority, and court-martial order failed to properly reflect Appellant's pretrial confinement credit; and (4) whether the staff judge advocate's recommendation (SJAR) failed to provide accurate and proper advice to the convening authority. In addition, Appellant personally raises four issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (5) whether Appellant's plea is improvident because his trial defense counsel pressured him to plead guilty and the military judge improperly stated that Appellant's pretrial agreement was a "good deal;" (6) whether Appellant suffered cruel and unusual punishment in violation of the Eighth Amendment[3] and Article 55, UCMJ, 10 U.S.C. § 855, when he was subjected to sexual harassment while in post-trial confinement; (7) whether Appellant's sentence is inappropriately severe, warranting relief under Article 66(c), UCMJ, 10 U.S.C.

---

[1] Unless otherwise noted, references to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). Appellant's case was referred to trial on 30 November 2018.

[2] The convening authority agreed to withdraw and dismiss one additional specification of attempted sexual abuse of a child and two specifications of attempted sexual assault of a child, in violation of Article 80, UCMJ, 10 U.S.C. § 880. The PTA did not include a limitation on sentence.

[3] U.S. CONST. amend. VIII.

§ 866(c); and (8) whether relief is warranted due to delays in the post-trial processing of his case.

With respect to issues (4),[4] (5), and (6), we have carefully considered Appellant's contentions and find those issues do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no prejudicial error, we affirm the findings and sentence.

# I. BACKGROUND

Appellant entered active duty on 6 June 2017. A few weeks after getting married, and just after New Year's Day in early January 2018, Appellant arrived to his first permanent duty station, Royal Air Force (RAF) Lakenheath, United Kingdom. At the time he committed the offenses, Appellant had been at RAF Lakenheath for eight days and was one month shy of his nineteenth birthday.

Shortly before the charged timeframe, Appellant's wife told him that she was not going overseas with him and questioned their marriage. On 11 January 2018, Appellant downloaded a social media application, "Meet24," that allows subscribers to exchange messages. Appellant downloaded Meet24 with the intention of finding female companionship. Once downloaded, Appellant began corresponding with "Jodie Walsh," who told Appellant she was 13 years old. Appellant and "Jodie" eventually transitioned to a different messaging application, "WhatsApp."

From 11 January 2018 to 13 January 2018, Appellant and "Jodie" exchanged numerous text messages. Appellant's texts quickly became sexually explicit and included indecent propositions to engage in sexual conduct with "Jodie." Among other texts, Appellant asked "Jodie" to see her "p*ssy" (or as she called it, her "fairy"), asked if she would perform oral sex on him, and stated that he could perform oral sex on her. Appellant described ejaculation and how a female gets pregnant, and then asked if she would allow Appellant to put his "d*ck" inside her "fairy" and stated that he wanted to "lick" her "fairy." Throughout their conversations, "Jodie" told Appellant numerous times she was 13 years old.

---

[4] Appellant argues the SJAR and RRT are faulty because both documents fail to inform that the military judge directed the convening authority to credit Appellant with 37 days for illegal pretrial confinement. We resolve this contention in this opinion.

On 12 January 2018, Appellant sent "Jodie" a picture of his erect penis hoping that "she would send a sexually explicit picture in return." After Appellant sent the picture, he asked "Jodie" to delete their whole conversation, because "if the cops or the Air Force found out, [he] would get in trouble."

Despite knowing "Jodie" was 13 years old, Appellant and "Jodie" discussed meeting on the evening of 13 January 2018 at a McDonald's restaurant in Birmingham, United Kingdom, approximately 121 miles and a two-hour drive from RAF Lakenheath. According to the stipulation of fact, "During the drive [Appellant] went back and forth about the idea of meeting up with [Jodie], but pressed on anyway."

Shortly after his arrival at the McDonald's, five individuals confronted Appellant and prevented him from leaving the area by physically restraining him. The individuals were affiliated with "Defending the Innocent," a local "vigilante" group that describes itself as "pedophile hunters."[5] Once Appellant was apprehended, a member of the group began to broadcast the confrontation on "Facebook Live." One of the individuals who was present, LM, identified herself as the person behind the "Jodie Walsh" pseudonym. For nearly 13 minutes, Appellant was repeatedly called a "pedophile," antagonized with facts about his communications with "Jodie," and was prevented from fleeing as onlookers watched. Appellant asserted that he was going "to turn around" after walking out of the McDonald's, however, he made this comment only after being accosted by members of Defending the Innocent.

Appellant would later reflect on the incident in his unsworn statement at the sentencing hearing, stating "I was really scared. I begged them to let me go. I thought they might be terrorists targeting me because I am American. . . . Then they moved me away from the people . . . to a little secluded area . . . I wasn't sure what was going to happen to me."

A member of the group called the police, who quickly arrived at the scene and promptly arrested Appellant. The livestream video had been viewed

---

[5] According to the stipulation of fact, the group "coordinate[s] and participates in non-government sanctioned operations online in an attempt to confront people they believe to be 'child predators' in the area local to Birmingham, United Kingdom." Members often pose as minors on dating applications in an effort to combat online child exploitation. If a person engages in sexual conversation or solicitation with a persona operated by a member of the group, a meeting is arranged and members of the group will confront the person and turn that person over to law enforcement. A member of the group, LM, testified that members have no training, screening, or professional qualifications. She further testified that members pay their own expenses, and that the group is not supported, endorsed, or approved by British law enforcement.

28,500 times on Facebook at the time the parties agreed to a stipulation of fact that was admitted at Appellant's court-martial. Appellant subsequently confessed to his actions, as well to British authorities and agents of the Air Force Office of Special Investigations.

## II. DISCUSSION

### A. Denial of Defense Witness in Presentencing

#### 1. Additional Background

At Appellant's sentencing hearing, trial defense counsel sought to introduce the testimony of JG, one of the leaders of Defending the Innocent.[6] Trial defense counsel proffered that JG was present at Appellant's apprehension and would testify about the phone call made to British authorities to arrest Appellant, as well as the tactics of the group. Trial defense counsel also stated that his goal in calling JG was to "help the court understand the vigilantism that's at play here and the impact it had on [Appellant]." Finally, trial defense counsel contended that JG's testimony would "help illustrate" what Appellant went through the night he was confronted by the group.[7] He did not state he was offering the testimony as a matter in mitigation.

Trial counsel objected, explaining that JG's testimony would be cumulative and do "very little to move the ball on the issue of mitigation," as ample facts had been introduced about the circumstances of Appellant's crimes, including the stipulation of fact and the video of Appellant's "sting." Additionally, trial counsel noted LM, another participant in Defending the Innocent, had just testified. Trial counsel also anticipated trial defense counsel wanted to inquire into JG's past regarding a civilian conviction from nine years earlier. Trial

[6] The court notes this is not the first case we have seen involving JG and "Defending the Innocent." *See United States v. Ozbirn*, No. ACM 39556, 2020 CCA LEXIS 138 (A.F. Ct. Crim. App. 1 May 2020) (unpub. op), *rev. granted*, ___ M.J. ___ , No. 20-0286, 2020 CAAF LEXIS 550 (C.A.A.F. 1 Oct. 2020) (The Court of Appeals for the Armed Forces (CAAF) granted Appellant's petition on the following issue: "Whether the evidence that Appellant asked for 'naked pictures' from adults pretending to be minors is legally sufficient to sustain a conviction for attempted receipt of child pornography.").

[7] Trial defense counsel explained, "The reason I am calling [JG], Your Honor, and I will be completely frank. A group of UK civilians ambushed my client in a parking lot within a stone's throw of a police station. They could have and should have called the police if they believed criminal activity was afoot, but they didn't. They waited for him to show up, they watched, and then they ambushed him. They put it on Facebook. They grabbed him in the dark. They drug him across the parking lot. They put him up against the fence. They berated him for 10 minutes and then finally they call the cops."

counsel argued that the probative value of JG's potential testimony was substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. Trial defense counsel acknowledged that he did in fact want to impeach JG through a conviction he received.

The military judge responded,

> I don't need [JG] to make [it] any more clear. I don't know what misperception you're trying to clear up with the vigilantism. What misperception is out there from the vigilantism; that they are somehow great people because they are doing this? I don't know that they are great people. I think they are people that have some, they for some reason want to go and do this. I got it. It may be for their own bluster so that they can pound their chests and say how great they are, what great citizens they are of the United Kingdom and the world because they are stopping people who are doing this. I get it but that doesn't matter. Does it? Does that matter for him pleading guilty in this case and for the sentence that he should get?

Trial defense counsel responded, "the tactics that they use in a group that they formed to apprehend and detain and humiliate my client publicly, that matters. . . . [a]nd that is what I want to highlight to the court."

The military judge disallowed trial defense counsel from calling JG, stating he would not allow degrading questions to be asked under Mil. R. Evid. 303. The military judge further found the probative value of JG's potential testimony was substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403, and that JG's testimony was not proper extenuation or mitigation evidence under R.C.M. 1001.[8]

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Hutchins*, 78 M.J. 437, 444 (C.A.A.F. 2019) (citations omitted). Military judges abuse their discretion when their "factual findings are clearly erroneous, view of law is erroneous, or decision is outside the range of reasonable choices." *Id.* (citations omitted). In applying the Mil. R. Evid. 403 balancing test, military judges enjoy "wide discretion." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations omitted). However, we give less deference to military judges' decisions if they do not explain their

---

[8] We note the military judge cited Mil. R. Evid. 303, Mil. R. Evid. 403, and R.C.M. 1001, but did not cite Mil. R. Evid. 401 or indicate that he decided the issue based on a Mil. R. Evid. 401 relevance analysis.

analysis on the record, and we give military judges no deference when they fail to conduct the analysis at all. *Id.*

Statements and evidence are inadmissible if they are not material to the issue and may tend to degrade the person testifying. Mil. R. Evid. 303. Evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action. Mil. R. Evid. 401. The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence. Mil. R. Evid. 403.

"The defense may present matters in rebuttal of any material presented by the prosecution and may present matters in extenuation and mitigation regardless whether the defense offered evidence before findings." R.C.M. 1001(c)(1). "Matter[s] in extenuation of an offense serve to explain the circumstances surrounding the commission of an offense . . . . Matter[s] in mitigation [are] introduced to lessen the punishment to be adjudged by the court-martial, or to furnish grounds for a recommendation of clemency." R.C.M. 1001(c)(1)(A)–(B).

### 3. Analysis

In deciding whether to exclude JG's testimony, the military judge clearly understood the nature of this "sting" and the impact it had on Appellant based on the evidence admitted. The military judge also expressed his concern about the paths trial defense counsel wanted to explore regarding the nature and tactics of the group (some of which came out during LM's testimony) and JG's prior conviction. The military judge specifically questioned how this information was relevant in helping him make a sentencing decision, recognizing Appellant pleaded guilty to his crimes. At one point, when discerning trial defense counsel's reasoning, the military judge stated what he understood to be the Defense's reasoning: "[So] we are going to bring anybody involved in here and we are going to embarrass them by calling them criminals and we want you to consider that just because it somehow helps our guy be considered differently." As the Government rightfully notes in its answer to Appellant's brief, "The military judge was not there to sentence the group Defending the Innocent . . . ."

The record shows the military judge conducted a balancing test under Mil. R. Evid. 403 before excluding JG's testimony. We can discern from his comments and questions that he found the testimony would have little relevance to extenuation or mitigation, it was cumulative, and it would embarrass the witness needlessly.

Although the military judge sustained the Government's objection to JG's testimony, he understood the mitigation aspects of this sting, stating, "I can put myself in an 18-year-old person's body and realize what it is like to be confronted by six people in a foreign parking lot in the dark in a country I had only been in for eight days."

Recognizing that military judges enjoy "wide discretion," we are not convinced that the military judge committed a clear error in his factual findings or view of the law. We find he did not abuse his discretion in precluding JG from testifying in this sentencing hearing.

## B. Pretrial Confinement Credit

Appellant alleges the military judge erred by failing to deduct 37 days of confinement credit for Appellant's illegal pretrial punishment prior to announcement of sentence, and, that the credit was not properly reflected on the RRT, action of the convening authority, and the court-martial order.

### 1. Additional Background

Appellant was arrested by British authorities on 13 January 2018 and then held overnight in a British confinement facility; the next day, he was released to his unit. Upon his return to RAF Lakenheath, for the next five days, during duty hours, Appellant was allowed to report for duty at his normal work center. After duty hours, Appellant was able to move about the base, but only with an escort. Appellant had a cadre of noncommissioned officers providing "around-the-clock" supervision. Appellant was also prohibited from using electronic devices.

After the five days, Appellant was told by his first sergeant that he was not allowed to leave the limits of RAF Lakenheath. Appellant remained restricted to base for 54 days, until 14 March 2018, when British authorities decided to withdraw prosecution of Appellant. Jurisdiction of this case was formally turned over to the Air Force on 15 June 2018.[9]

Before he entered into the PTA, Appellant filed a motion for relief requesting credit for unlawful pretrial punishment under Article 13, UCMJ, 10 U.S.C. § 813. Appellant argued the five-day period he was restricted to base under escort supervision was tantamount to confinement and that the provisions of R.C.M. 305 were violated, including the fact that the Government failed to conduct a 48-hour review to confirm probable cause. For these five days, Appellant

---

[9] According to the British prosecutor, there was "not enough evidence to provide a realistic prospect of conviction."

argued he was entitled to five days of *Mason* credit,[10] and an additional five days of administrative credit, pursuant to R.C.M. 305(k), for a total of ten days of pretrial confinement credit.

Additionally, Appellant requested an additional 27 days' pretrial confinement credit due to his being restricted to base. In calculating this number, Appellant asked for half-day credit for the 54 days he was restricted to base because the pretrial restriction was not imposed by a proper authority (a commissioned officer), and because there was no articulated legitimate "nonpunitive governmental objective for the restriction."

Although there was a provision in the PTA that Appellant waived all waivable motions, trial defense counsel advised the military judge of *United States v. Inong*, where the United States Court of Appeals for the Armed Forces (CAAF) "urge[d] all military judges to remember that nothing precludes them from inquiring sua sponte into whether Article 13 violations have occurred, and prudence may very well dictate that they should." 58 M.J. 460, 465 (C.A.A.F. 2003). The military judge did inquire into the issue. After confirming some of the facts above through trial counsel, the military judge stated,

> I can't understand what the heck went on, exactly. I am not going to call in any witnesses for it. I am just going to give the credit that the defense asked for in my sentence. So, we won't call it a granting of the motion, but I am going to tell you right now that I am knocking off 27 days, plus the 10 days for pretrial confinement.

After deliberations, but just before he announced sentence, the military judge stated,

> I would like to state first that I subtracted 37 days from my sentence because of what I find to be unacceptable actions by the command with regard to [Appellant's] restriction and other restraints. In filing the motion, I don't consider this a reneging by the defense towards that aspect of the PTA, rather it was information that was brought to my attention that I thought needed to be addressed by me.

The military judge then sentenced Appellant to a dishonorable discharge, 503 days' confinement, reduction to E-1, and a reprimand. After he announced the sentence, circuit trial counsel sought clarification as to whether the sentence adjudged "already calculates the reduction or the . . . consideration made by the court . . . [with regard to the] actions. . . ." The military judge responded

---

[10] *See United States v. Mason*, 19 M.J. 274 (C.M.A. 1985), where day-for-day credit was given for "pretrial restriction equivalent to confinement."

simply, "What the court considers to be unacceptable conduct by the command with regard to [Appellant] and how he was treated after he was released by British authorities." Circuit trial counsel did not seek additional clarification.

After the court closed, all parties came back on the record, as it was brought to the military judge's attention that he failed to state after announcement of sentence that Appellant will be credited with two days of pretrial confinement credit for his time in the British confinement facility. The military judge again announced the sentence, and regarding confinement, stated, "[T]he sentence that should be is: . . . To be confined for 501, you know what, I apologize. 503 days . . . ." The military judge immediately followed by stating Appellant "[was] to be credited with two days of pretrial confinement," noting, "I don't deduct the two days from the sentence that I give, it gets deducted afterwards."[11]

**2. Law**

### *a. Pretrial confinement credit*

We review issues concerning the proper application of credit for illegal pretrial punishment de novo as it is a question of law. *United States v. Zarbatany*, 70 M.J. 169, 174 (C.A.A.F. 2011) (citing *United States v. Spaustat*, 57 M.J. 256, 260 (C.A.A.F. 2002)). "Article 13, UCMJ, relief can range from dismissal of the charges, to confinement credit or to the setting aside of a punitive discharge. Where relief is available, meaningful relief must be given for violations of Article 13, UCMJ. However, relief is not warranted or required where it would be disproportionate to the harm suffered or the nature of the offense." *Id.* at 170.

An appellant's "express waiver of any waivable motions" as part of a pretrial agreement "extinguishe[s] his right to raise these issues on appeal" unless the waiver is of a fundamental right. *United States v. Gladue*, 67 M.J. 311, 314 (C.A.A.F. 2009); *see also United States v. Seliskar*, No. ACM 38039, 2013 CCA LEXIS 329, at *7–8 (A.F. Ct. Crim. App. 16 Apr. 2013) (unpub. op.) ("Because pretrial punishment under Article 13, UCMJ, is not a fundamental right, and the appellant expressly and knowingly relinquished his right to raise that issue at trial, we decline to address the issue."). "Any part of a day in pretrial confinement must be calculated as a full day for purposes of pretrial confinement credit . . ." *United States v. Doane*, 54 M.J. 978, 984 (A.F. Ct. Crim. App. 2001) (citation omitted); *see also United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).

R.C.M. 304 applies to "pretrial restraint." "Restriction in lieu of arrest is the restraint of a person by oral or written orders directing the person to re-

---

[11] The court notes that Appellant was credited with two days of pretrial confinement, as listed on Appellant's DD Form 2707, *Confinement Order*, dated 26 March 2019.

main within specified limits; a restricted person shall, unless otherwise directed, perform full military duties while restricted." R.C.M. 304(a)(2). "Any commissioned officer may order pretrial restraint of any enlisted person." R.C.M. 304(b)(2). A commander may delegate his authority to order pretrial restraint of an enlisted person to a noncommissioned officer. R.C.M. 304(b)(3). "No person may be ordered into restraint before trial except for probable cause." R.C.M. 304(c).

R.C.M. 305 applies to "pretrial confinement."

> R.C.M. 305(b) directs that an accused may only be "confined if the requirements of this rule are met." Conspicuously absent from R.C.M. 305(b), or anywhere else in the R.C.M. 305 is any reference to applying the procedural or credit provisions of the rule to any other form of pretrial restraint. R.C.M. 305(k), the credit provision . . . is limited by unambiguous language to "confinement served" after noncompliance with R.C.M. 305(f), (h), (i), or (j). There is no support in R.C.M. 305 for applying R.C.M. 305(k) to any lesser form of restraint.

*United States v. Rendon*, 58 M.J. 221, 224 (C.A.A.F. 2003).

### b. Post-trial processing

The standard of review for determining whether post-trial processing was properly completed is de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)).

In *United States v. Crawford*, the CAAF held that if an appellant establishes a violation of Article 13, UCMJ, "then R.C.M. 305(k) provides him additional credit for each day of pretrial confinement that involves an abuse of discretion or unusually harsh circumstances." 62 M.J. 411, 414 (C.A.A.F. 2006) (internal quotation marks and citations omitted). "The convening authority is required 'to direct application of all confinement credits for violations of Article 13[, UCMJ] . . . against the approved sentence.'" *Howell v. United States*, 75 M.J. 386, 390 (C.A.A.F. 2016) (quoting *Spaustat*, 57 M.J. at 263–64). Accordingly, when a military judge orders credit for illegal pretrial confinement for violations of Article 13, UCMJ, the credit shall be included in the convening authority's initial action. R.C.M. 1107(f)(4)(F).

"Because of the importance of the convening authority's action in the court-martial process," the CAAF requires it to be both "clear and unambiguous." *United States v. Politte,* 63 M.J. 24, 26 (C.A.A.F. 2006) (footnote omitted). We may instruct a convening authority to withdraw an incomplete, ambiguous, or erroneous action and substitute a corrected action. R.C.M. 1107(g); *see also* R.C.M. 1107(f)(2).

### 3. Analysis

Despite Appellant's waiver of his right to make a motion for relief under Article 13, UCMJ, as part of his PTA, the military judge opted to inquire about this issue. After hearing argument presented about Appellant's restriction to base, the military judge stated,

> I'm going to knock off 47 or 37 days, excuse me from my sentence. So I am just telling you that I am doing that. As far as I'm concerned the motion may or may not be waived, I am not ruling on that, but I am just telling you I am granting what the defense asked for and his motion in effect, I am granting the motion and whether it is waived or not, I don't think it matters at this point.

As the military judge did not rule on the motion, he did not issue any findings of fact. While the military judge did not fully explain his rationale for how he calculated the number of days he was crediting against Appellant's sentence, considering what he did state on the record, including his reference to the Defense motion, we can confidently determine his intent.

We surmise that as a baseline, the military judge determined a sentence to confinement of 540 days (or 18 months) was appropriate for the offenses, and it was his intent to reduce that baseline sentence from 540 days to 503 days. Without granting Appellant's motion, the military judge reduced the sentence he would impose on Appellant by 37 days.

Appellant now argues the military judge should have announced sentence and then applied any credit against the adjudged sentence. In failing to do so, Appellant contends that he should have received credit for 37 days against the adjudged sentence of 503 days, thereby reducing the confinement that the convening authority was authorized to approve to 466 days.

However, the military judge did not actually grant Appellant's motion, nor did he order any credit. We recognize it would have made his intent more clear to state unequivocally whether he was granting Appellant's motion on the one hand, or factoring in circumstances relating to command's actions in reaching the sentence he determined was appropriate, on the other. As discussed above, we conclude he intended to consider these matters in determining an appropriate sentence. Therefore, we decline to affirm only 466 days of confinement. We also decline to order the convening authority to credit Appellant with an additional 37 days of confinement from Appellant's adjudged sentence of 503 days.

## C. Post-Trial Docketing

### 1. Law

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno,*

63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, when the record of trial is not docketed with the Court of Criminal Appeals within 30 days of action, or when the Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id.* at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey*, 60 M.J. at 102). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

### 2. Analysis

Appellant's trial concluded on 26 March 2019. The convening authority took action on the sentence on 23 July 2019, 119 days later. Fourteen days later, on 6 August 2019, the action was amended, and Appellant's case was docketed on 28 August 2019, 22 days later. However, 36 days passed from when action was initially taken to docketing with this court. Appellant argues he is entitled to relief because his case was not docketed with this court within 30 days of the initial action by the convening authority.

We note that the 36 days that elapsed between the action of the convening authority and docketing with this court exceeded by six days the 30-day standard for a presumptively unreasonable post-trial delay. *See Moreno*, 63 M.J. at 142. Therefore, we have considered the four *Barker* factors to determine whether Appellant's due process right to timely post-trial and appellate review has been violated in this case. We find it has not.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted). In this case, we find no oppressive incarceration, nor do we discern any impairment of Appellant's ability to present a defense at a rehearing. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* at 140. Appellant has asserted no such particularized concern while awaiting an appellate decision. Further, we find no qualifying prejudice from the six-day delay, or any due process violation

so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362.

In the absence of a due process violation, this court considers whether relief for excessive post-trial delay is warranted consistent with this court's authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d). *See United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002). Having considered the entire record and the particular facts and circumstances of this case, we find Appellant is not entitled to any relief on this issue.

### D. Severity of Appellant's Sentence

#### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (footnote omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ. In determining whether a sentence should be approved, our authority is "not legality alone, but legality limited by appropriateness." *United States v. Nerad*, 69 M.J. 138, 141 (C.A.A.F. 2010) (citing *United States v. Atkins*, 23 C.M.R. 301, 303 (C.M.A. 1957)). This authority is "a sweeping congressional mandate to the Courts of Criminal Appeal to ensure a fair and just punishment for every accused." *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (internal quotation marks and footnote omitted). In determining sentence appropriateness, this court considers "the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009). Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *See United States v. Rapert*, 75 M.J. 164, 170 (C.A.A.F. 2016) (citing *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *Nerad*, 69 M.J. at 146.

#### 2. Analysis

We have given individualized consideration to Appellant, the nature and seriousness of his offenses as shown by the facts and circumstances, his record of service, and all other matters contained in the record of trial. We recognize that Appellant had numerous facts in extenuation and mitigation: (1) Appellant was 18 years, 11 months old when he committed his crimes; (2) Appellant, having been married for only a few weeks at the time of his crimes, was already facing the demise of his marriage; (3) the timeframe for Appellant's crimes is less than two days; (4) Appellant maintained a solid, if not admirable, work

performance from the date of the incident to his court-martial, a period of 14 months; (5) Appellant cooperated extensively with authorities; (6) searches of numerous other electronic devices belonging to Appellant found no evidence of activity indicative of searches for, or the possession of, child pornography, or any other sexual interest in children; (7) this case involved some form of "vigilante justice;" and (8) Appellant pleaded guilty pursuant to a PTA without a cap of confinement when he faced a maximum of 20 years' confinement.

However, we also note several aggravating factors: (1) Appellant pleaded guilty to two specifications of the attempted sexual abuse of a child; (2) the child, "Jodie," repeatedly told him that she was 13 years old; (3) the indecent language Appellant used in his attempted sexual abuse of a child was extremely graphic; (4) Appellant sent a picture of his penis to "Jodie" while watching adult pornography; (5) after sending the picture, Appellant asked "Jodie" if she would perform oral sex on him; and (6) although Appellant equivocated on whether or not to go through with the meeting during his drive to Birmingham, he ultimately completed the 121 mile journey and arrived at the predetermined meeting point, to meet "Jodie" in person.

All of these facts were presented to the military judge, who we presume followed the law and afforded individualized consideration to Appellant. We find Appellant's approved sentence of a dishonorable discharge, confinement for 503 days, and reduction to the grade of E-1 is not inappropriately severe as a matter of law.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court